UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Crim. No. 08-072 (PJS/SRN) |
| Plaintiff, | |
| v. | REPORT AND RECOMMENDATION |
| Timothy Conrad Rehak (01) and<br>Mark Paul Naylon (02), | |
| Defendants. | |

John R. Marti and Joseph T. Dixon III, Office of the United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Plaintiff United States of America

Kevin J. Short, Short Law Firm, 150 South Fifth Street, Suite 3260, Minneapolis, Minnesota 55402; and Paul C. Engh, Engh Law Office, 220 South Sixth Street, Suite 215, Minneapolis, Minnesota 55402, for Defendant Timothy Conrad Rehak

Paul W. Rogosheske, Thuet Pugh Rogosheske & Atkins, Ltd., 222 Grand Avenue West, Suite 100, South Saint Paul, Minnesota 55075, for Defendant Mark Paul Naylon

---

SUSAN RICHARD NELSON, United States Magistrate Judge

The above-entitled matter comes before the undersigned United States Magistrate Judge on Timothy Conrad Rehak's Motion to Dismiss Counts 1 Through 6 (Doc. No. 22), Motion to Dismiss Count 7 (Doc. No. 23), Motion to Dismiss Count 8 (Doc. No. 24), and Motion to Strike Surplusage (Doc. No. 25); and Defendant Mark Paul Naylon's Motion to Suppress Evidence (Doc. No. 34). This case has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1.

## I. BACKGROUND

Defendants Timothy Conrad Rehak and Mark Paul Naylon were charged by Indictment on March 4, 2008, of six counts of deprivation of honest services, in violation of 18 U.S.C.

§ 1343 and § 1346; one count of theft of government funds, in violation of 18 U.S.C. § 641; and one count of conspiracy to violate civil rights, in violation of 18 U.S.C. § 241. This Court held a pretrial motion hearing on May 12, 2008, at which Federal Bureau of Investigation (FBI) Special Agent Timothy Bisswurm testified. The Court also received several exhibits into evidence, which are listed on a separate exhibit list attached to the exhibits.

### A.     The Factual Allegations in the Indictment Related to the Scheme to Defraud

The following factual allegations are contained in the Indictment. Defendant Rehak was previously employed as an officer with the St. Paul Police Department, assigned to the Special Investigations Unit of the Ramsey County Sheriff's Department. Defendant Naylon was formerly the public information officer of the Ramsey County Sheriff's Department. The Indictment alleges that as part of their employment with state law enforcement agencies, Defendants Rehak and Naylon owed their honest and faithful services to the state and its citizens, but that Defendants devised a fraudulent scheme to unlawfully seize property and then to conceal their unlawful actions.

The Indictment lists five rules of conduct of the St. Paul Police Department that prohibit using an official position for personal gain, failing to perform a duty imposed by law, making a false report, failing to promptly submit a written report, and failing to inventory recovered property. The Indictment lists seven similar rules of conduct enacted by the Ramsey County Sheriff's Department. The Indictment also implicates three Minnesota state statutes: Minn. Stat. § 626.863, which prohibits a person who is not a licensed peace officer from performing an act reserved for such officers; Minn. Stat. § 626.52, subd. 2(1) and (5), which proscribes a person from taking or concealing the property of another with the intent to exercise temporary control and without the owner's consent; and Minn. Stat. § 626.16, which requires a police officer who

executes a search warrant to give a receipt to the person from whom the items were seized, or in the absence of such a person, to leave a copy of the receipt in the location where the items were seized.

The Indictment next alleges the following details of the alleged scheme to defraud. In November 2004, the FBI conducted an integrity test of Defendants through a cooperating individual (CI). The CI contacted Defendant Rehak and told him that a drug trafficker was attempting to recover drugs and currency that the trafficker had left in a hotel room. In fact, there was no such drug trafficker, and the FBI had rented the hotel room. Defendants Rehak and Naylon were working together at the time and went to the hotel. Defendants attempted to gain entry into the room without a search warrant, and when a hotel clerk stopped them, they contacted a Ramsey County Deputy to apply for a search warrant, which was issued later that day.

Defendants and the deputy executed the search warrant at about 3:30 p.m. While searching the room, Defendant Rehak located a bag containing $13,500 inside a dresser. When the deputy went into the bathroom, Defendant Naylon motioned for Defendant Rehak to give him some of the money, and Defendant Rehak gave him $6,000, which Defendant Naylon placed in his jacket pocket. Defendants then alerted the deputy to the seizure of the bag and showed him the remaining $7,500 inside. The deputy and Defendant Rehak separately inventoried the contents of the bag; neither counted the $6,000 that Defendant Naylon had placed in his pocket. Defendants Naylon and Rehak did not tell the deputy about the $6,000. The deputy called a canine unit to the scene, and the dog was instructed to sniff the $7,500 for the odor of narcotics. Defendants did not tell the officer handling the canine about the other $6,000, and the canine was not permitted to sniff that money. After the search was complete and Defendants had left the

hotel, FBI agents entered and confirmed that the full $13,50 had been taken from the room.

After the execution of the search warrant, Defendants allegedly became suspicious that a drug trafficker would leave such a large amount of cash in a hotel room. They caused several law enforcement databases to be searched for the name of the fictitious trafficker, but found no such person, which allegedly alerted them to the possibility of an integrity test. Later that night, Defendants each called the deputy who had assisted in the search and told him that an additional $6,000 had been seized. They said that the money had been recovered from the box spring or mattress of the bed in the hotel room. The next day, Defendants gave the $6,000 to the deputy, who changed the inventory to reflect the full $13,500.

In June 2005, the FBI conducted a second integrity test. The same CI called Defendant Rehak on June 12, 2005, and said that a drug trafficker had left drugs and money in a vehicle. The CI described the vehicle and its location. In truth, the FBI had parked the vehicle. Late that night, at approximately 11:00 p.m., Defendants Rehak and Naylon were seen near the vehicle, but they did not enter it. At 11:14 p.m., a query was submitted to a law enforcement database from the St. Paul Police Department concerning the license plate number of the vehicle.

The next day, the CI called Defendant Rehak and said that the vehicle had been moved but that it still contained drugs and money. Defendant Naylon surveilled the car that afternoon and wrote down the vehicle identification number. At approximately 5:16 p.m. that day, there were several queries to official databases from the Ramsey County Sheriff's Department about the vehicle. The search results revealed that the vehicle had been stolen. Fourteen minutes later, Defendants called a canine unit to the scene to sniff the vehicle, and the canine did not alert to the presence of narcotics. Indeed, the FBI had left money inside the car, but no drugs. That night, at approximately 10:00 p.m., Defendants returned to the parking lot and entered the

4

vehicle. They found a bag inside the trunk, which contained money but no drugs. Allegedly suspecting a second integrity test, Defendants decided to treat the incident as having found a stolen vehicle, and they arranged for the car to be towed. All of the property, including the money, was inventoried.

### B.     The Search of Defendant Naylon's Office and Vehicle

The following facts were elicited from the testimony and exhibits introduced at the motion hearing. On February 2, 2007, FBI Special Agent Bisswurm asked Ramsey County Sheriff Bob Fletcher for permission to search Defendant Naylon's office at the Sheriff's Department and his squad car. Sheriff Fletcher told the agent that Defendant Naylon was on vacation in Florida, but Sheriff Fletcher gave his consent to the search and signed a written consent-to-search form. (Gov't Ex. 1.) According to Ramsey County Sheriff's Department policy, all property of the department, including take-home squad cars, is subject to inspection at any time without notice. (Gov't Exs. 2, 3.)

That night, Special Agent Bisswurm and two other agents went to Defendant Naylon's residence to search the car. They did not see the squad car outside, so Special Agent Bisswurm knocked and rang the doorbell. Defendant Naylon's adult children, a twenty-five year-old son named Marco and a twenty-three year-old daughter, answered the door. The agents displayed their credentials, explained the nature of the investigation, showed them the consent form, and asked for permission to enter the property in order to search the vehicle. Defendant Naylon's children agreed to the search, said the car was in the garage, and gave the agents the car keys.

Special Agent Bisswurm asked Marco Naylon to witness the search, and throughout the search, Marco Naylon moved freely between the house and the garage. At times, he used the telephone. About twenty minutes into the search, Marco told Special Agent Bisswurm that his

5

father's attorney was on the phone and wanted to speak with one of the officers. Special Agent Bisswurm told the lawyer that the search was being conducted pursuant to a valid consent. The lawyer did not ask the agent to stop the search, and neither Marco nor his sister ever withdrew their consent to the search. All of the parties involved were cooperative and courteous.

## II.  DISCUSSION

### A.  Motion to Dismiss Counts 1 Through 6

Defendants[1] move to dismiss Counts 1 through 6 of the Indictment, which charge them with deprivation of honest services in violation of the wire fraud statute, 18 U.S.C. § 1343 and § 1346. Section 1343 provides in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343. "The essential elements of wire fraud are a scheme to defraud, the use of interstate wires incident to the scheme, and an intent to cause harm." United States v. Frank, 354 F.3d 910, 918 (8th Cir. 2004). A scheme to defraud includes a "scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. The statute does not define the phrase "honest services," and courts have grappled with the breadth of this phrase. With respect to honest services owed by a public official, the Eighth Circuit has recently identified two key considerations: "whether the public official misused a discretionary position

---

[1] Defendant Naylon moved to join in Defendant Rehak's pretrial motions, and the Government did not oppose the joinder. The Court therefore granted the motion by separate Order and will consider Defendant Rehak's motions as also having been filed by Defendant Naylon.

6

and whether the official failed to disclose a material conflict." <u>United States v. Jennings</u>, 487 F.3d 564, 577 (8th Cir. 2007) (citations omitted).

Defendants' position in seeking dismissal of the deprivation of honest services charges is that the counts do not allege a criminal offense. In support of this position, Defendants rely almost exclusively on <u>United States Brown</u>, 459 F.3d 509 (5th Cir. 2006). In that case, the government accused the defendants, who were former employees of Enron and Merrill Lynch, of defrauding Enron and its shareholders by causing Enron's year-end earnings report to be artificially inflated. <u>Id.</u> at 513. The court began its discussion by noting that "honest services" may be owed to an employer under state law and includes fiduciary duties created by the employment relationship. <u>Id.</u> at 519 (citations omitted). To prove that a breach of fiduciary duty was an illegal fraud, some proof of detriment to the employer is required. <u>Id.</u> (citation omitted).

The government had argued that the defendants breached their fiduciary duties to Enron by not disclosing the full truth about the transaction, thereby causing the artificial inflation of earnings, which resulted in personal benefits to the defendants and both benefits and detriments to Enron. <u>Id.</u> at 520. The defendants, on the other hand, had argued that the outer boundaries of what could be considered honest services were defined by the set of cases upholding convictions under that theory, and that no factually similar case had been decided. <u>Id.</u> at 520 & n.9. The court acknowledged that the wire fraud statute itself did not define the term "honest services" but that the meaning of the phrase was defined by evolving case authority. <u>Id.</u> at 521 n.10. The court then looked to a pivotal case from the Second Circuit, <u>United States v. Rybicki</u>, 354 F.3d 124 (2d Cir. 2003) (en banc), which concluded that cases upholding convictions for deprivation of honest services could generally be categorized as resembling bribery or self-dealing. <u>Id.</u> at 521. The scheme as alleged by the government in <u>Brown</u> presented an atypical situation in that

7

the dishonest conduct did not correlate to bribery or self-dealing; rather, the conduct was concomitant with Enron's own interests. Id. at 522. Indeed, Enron had intentionally aligned its corporate goals with its employees' financial interests. Id. The court thus concluded:

> Given that the only personal benefit or incentive originated with Enron itself - not from a third party as in the case of bribery or kickbacks, nor from one's own business affairs outside the fiduciary relationship as in the case of self-dealing - Enron's legitimate interests were not so clearly distinguishable from the corporate goals communicated to the Defendants (via their compensation incentives) that the Defendants should have recognized, based on the nature of our past case law, that the "employee services" taken to achieve those corporate goals constituted a criminal breach of duty to Enron. We therefore conclude that the scheme as alleged falls outside the scope of honest-services fraud.

Id.

As the Government has noted, Brown differs in significant factual respects from this case. Brown involved private actors, not public officials, as well as an entirely different scheme. Nevertheless, invoking Brown, Defendants claim that a charge of honest services deprivation cannot be predicated on mere violations of ethical codes, departmental policies, or even state law. (Def. Rehak's Reply at 3-4.) Defendants' reliance on Brown is misplaced, however, as Brown does not address this precise issue. Even more critically, Defendants' position is at least partially inconsistent with precedent from this circuit.

If the Government proves a violation of state law at trial, this would be sufficient to show a deprivation of honest services. See Jennings, 487 F.3d at 578. It is true, as both parties acknowledge, that the Jennings court expressly declined to decide whether a violation of state law is always necessary to prove a deprivation of honest services or whether a fiduciary duty can arise from some other source. Id. at 577-78. Because this question is unresolved in this circuit, the Court cannot conclude that the Government is foreclosed from attempting to show a breach of fiduciary duty based on ethical codes or departmental policies, along with the state law

8

violations alleged.[2]

      Defendants also argue that this case is similar to Brown because the victims in this case also allegedly participated in the fraud, thereby aligning their interests with those of Defendants. Equating Defendants with the Enron employees, and the citizens of Minnesota with Enron, is nonsensical. How the state of Minnesota and its citizens could have benefitted from the alleged actions of Defendants is unfathomable. They certainly did not benefit financially, as Enron did. Accordingly, the Court finds this argument wholly unpersuasive.

      It would be remiss to conclude this discussion of Brown without noting one final, critical distinction. Brown was decided post-trial, after the government had an opportunity to put its evidence to the test. At this stage of this case, the Court cannot conclude that there are no set of facts which could support a conviction for deprivation of honest services under the theory advanced by the Government.[3]

---

[2] A review of the law in other circuits is helpful only in that it reveals significant discrepancies as to what the government must show in order to prove a deprivation of honest services by a public official. The Third and Fifth Circuits require the government to show that the scheme to defraud involved a violation of state law. United States v. Murphy, 323 F.3d 102, 116-17 (3rd Cir. 2003); United States v. Brumley, 116 F.3d 728, 734-35 (5th Cir. 1997) (en banc). The Seventh Circuit does not require a violation of state law, but evidence that the defendant breached his or her fiduciary duty and misused his or her public office for private gain. See United States v. Bloom, 149 F.3d 649, 655 (7th Cir. 1998). In the First Circuit, the government may show a breach of fiduciary duty either arising from statute or owed by a public official to the public at large. United States v. Sawyer, 239 F.3d 31, 40, 41-42 (1st Cir. 2001); United States v. Woodward, 149 F.3d 46, 62 (1st Cir. 1998). The Eleventh Circuit recently upheld the conviction of a police officer for conspiring to deprive his honest services where the officer breached his fiduciary duty in part by violating a police department regulation. United States v. Woodard, 459 F.3d 1078, 1086-87 & n.8 (11th Cir. 2006); see also United States v. deVegter, 198 F.3d 1324, 1328 (11th Cir. 1999) (noting that the inherent fiduciary duty to act in the public's best interest can support a conviction for deprivation of honest services).

[3] Jennings was also decided post-trial. The issue presented was whether the evidence was sufficient to support the defendant's conviction. Jennings, 487 F.3d at 576.

In sum, Brown is factually and legally distinguishable from the case at hand in numerous respects and does not provide a basis to dismiss Counts 1 through 6.  While the Government's theory of prosecution might be novel and untested, the Court cannot conclude at this stage of the case that it is an impermissible interpretation of the statute.  The Indictment sufficiently alleges six counts of deprivation of honest services in violation of the wire fraud statute, and Defendants' motion to dismiss these charges should be denied.

**B.     Motion to Strike Surplusage**

Defendants seek to strike paragraphs 7 and 8, which list the guidelines of the St. Paul Police Department and the Ramsey County Sheriff's Department; paragraphs 8, 9, and 10, which list the Minnesota statutes; and paragraphs 13-32 and 34-39, which describe the alleged scheme to defraud.

Federal Rule of Criminal Procedure 7(d) permits a court to strike surplusage from an indictment on a defendant's motion.  "A motion to strike surplusage from an indictment is addressed to the sound discretion of the District Court and should be granted only where it is clear that the allegations contained therein are not relevant to the charge made or contain inflammatory and prejudicial matter."  Dranow v. United States, 307 F.2d 545, 558 (8th Cir. 1962).

Defendants' motion to strike paragraphs 7, 8, 9, and 10 is based on their view that violations of state law and departmental guidelines cannot be the basis for a charge of deprivation of honest services.  As noted above, that position is partly incorrect and partly unsettled, and thus, it is not clear that the challenged allegations are irrelevant or that they contain inflammatory and prejudicial material.

Defendants relatedly argue that the Government is seeking to criminalize violations of

departmental regulations and state civil statutes, citing <u>State v. Serstock</u>, 402 N.W.2d 514 (1987), and <u>Gonzales v. Oregon</u>, 546 U.S. 243 (2006).  However, neither of these cases dealt with the honest services theory of wire fraud, and the Court finds them inapplicable to this case.  Moreover, <u>Jennings</u> provides clear support to the contrary.  The court in <u>Jennings</u> endorsed the position that a violation of a state campaign finance disclosure statute—a civil statute—would be proof of a public official's intent to defraud the public of its right to the official's honest services under § 1346.  487 F.3d at 578.

Defendants also move to strike the narrative description of the alleged fraudulent scheme as "slanted and forced."  (Def. Rehak's Mot. Strike Surplusage at 3.)  However, "slanted and forced" is not the standard; the question is whether the language is "inflammatory and prejudicial."  The Court finds that the narrative contains no inordinate prejudicial or passionate language; it plainly, albeit comprehensively, describes the facts comprising the alleged scheme.  And while such verbose indictments are not the norm, the Court cannot say they are unheard of, especially in cases alleging a fraudulent scheme.  As long as the Government's evidence at trial parallels the factual allegations, the surplusage is not inflammatory or prejudicial.  See <u>United States v. Figueroa</u>, 900 F.2d 1211, 1218 (8th Cir. 1990).

Finally, it appears that Defendants' real concern is that the entire Indictment will be read to the jury in order to unduly influence it.  To alleviate this concern, Defendants can move for a jury instruction that the Indictment's allegations are not evidence, <u>see id.</u>, or raise this issue in some other manner with the District Court at trial.  Defendants' motion to strike surplusage should be denied.

### C. Motion to Dismiss Count 7

Defendants move to dismiss Count 7 of the Indictment, which alleges a violation of 18

U.S.C. § 641. This statute provides in pertinent part:

> Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or
>
> Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted–
>
> Shall be fined under this title or imprisoned not more than ten years, or both; but if the value of such property in the aggregate, combining amounts from all the counts for which the defendant is convicted in a single case, does not exceed the sum of $1,000, he shall be fined under this title or imprisoned not more than one year, or both.

18 U.S.C. § 641. Defendants argue that the alleged taking of money was temporary in nature and that a temporary taking is not prohibited by § 641.

Although it is true that the Eighth Circuit has not expressly held that an act proscribed by § 641 may be temporary in nature, the Court finds the Supreme Court case of Morissette v. United States, 342 U.S. 246 (1952), instructive.

> Conversion . . . may be consummated without any intent to keep and without any wrongful taking, where the initial possession by the converter was entirely lawful. Conversion may include misuse or abuse of property. It may reach use in an unauthorized manner or to an unauthorized extent of property placed in one's custody for limited use. Money rightfully taken into one's custody may be converted without any intent to keep or embezzle it merely by commingling it with the custodian's own, if he was under a duty to keep it separate and intact. It is not difficult to think of intentional and knowing abuses and unauthorized uses of government property that might be knowing conversions but which could not be reached as embezzlement, stealing or purloining.

Id. at 271-72. Thus, even if the evidence at trial shows that Defendants never intended to permanently possess the money and in fact returned it, it is still possible for the Government to prevail under a conversion theory.

Moreover, other circuit courts of appeal have held that a temporary taking can constitute

theft or stealing.  See United States v. Jackson, 401 F.3d 747, 749 (6th Cir. 2005) (stating that a permanent deprivation is not required to support a conclusion that property was stolen); United States v. Sparkman, 112 F. App'x 358, 360 (5th Cir. 2004) (expressly holding that a temporary taking of government funds violates § 641).  Accordingly, Defendants' motion to dismiss Count 7 should be denied.

### D. Motion to Dismiss Count 8

Court 8 alleges that Defendants, acting under color of state law, conspired with each other to deprive the citizens of Minnesota of property without due process, in violation of 18 U.S.C. § 241.  Section 241 prohibits two or more people from conspiring to oppress, injure, threaten, or intimidate any person "in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States . . . ."  18 U.S.C. § 241.

Defendants first seek dismissal of the § 241 conspiracy charge on the basis that the retention of cash and failure to record it on the inventory sheet was an exercise of their discretion as police officers, which shields them from prosecution.  While this argument may be a defense in the civil context, Defendants have not provided any authority that this is a basis on which to dismiss a criminal charge.

Defendants also argue that a retention of money for a short period of time does not equate to a due process violation of constitutional magnitude.  However, conspiracy is the gravamen of the charge brought under § 241, see Walker v. United States, 93 F.2d 383, 387 (8th Cir. 1937) (citations omitted), not the underlying constitutional right.  The agreement is the crux of a conspiracy charge, "regardless of whether the crime agreed upon actually is committed."  United States v. Feola, 420 U.S. 671, 694 (1975); see also United States v. Lee, 6 F.3d 1297, 1307 (8th Cir. 1993) (per curiam) (Lay, J., concurring and dissenting) ("In prosecuting a criminal

conspiracy case, the evidence of what actually occurred does not necessarily defeat proof of the conspiracy.  The focus must be on the agreement and on what [the conspirators] intended.").  Although the Indictment alleges the temporary taking of $6,000 as an overt act, this allegation was not even required as the Government need not prove an overt act to obtain a conviction under § 241.  See Smith v. United States, 157 F. 721, 725-26 (8th Cir. 1907); United States v. Morado, 454 F.2d 167, 169 (5th Cir. 1972) (to prove a § 241 conspiracy to injure the federally protected rights of voters, the government did not have to show that the objective was achieved, that a single vote was cast, or even that an election occurred at all); see also Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit § 5.06A n.2 (2008) ("An overt act is not required in conspiracies charged under . . . 18 U.S.C. §[] 241 . . . .").  Given that the Government need not prove that a violation of due process actually occurred, it is inconsequential whether the temporary taking actually violated due process.

On a motion to dismiss the indictment, the question is whether the indictment sufficiently alleges an offense against the defendant.  "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  Hamling v. United States, 418 U.S. 87, 117 (1974).  The Indictment in this case alleges that Defendants, while acting under color of state law, willfully conspired to injure persons in Minnesota in their free exercise and enjoyment of the constitutional right not to be deprived of property without due process of law.  This language closely tracks the language of the charging statute and identifies the constitutional right affected; as such, the Indictment fairly informs Defendants of the charge against which they must defend and enables them to plead an acquittal or conviction as a bar to any future prosecution.  This is

14

all that is required to sufficiently allege a violation of 18 U.S.C. § 241, and Defendant's motion to dismiss Count 8 should be denied.

      **E.**      **Defendant Naylon's Motion to Suppress Evidence**

Defendant Naylon moves to suppress evidence seized from his office and department-issued vehicle. He directs the Court to two cases in support of his request, Chapman v. United States, 365 U.S. 610 (1961), and United States v. Speights, 557 F.2d 362 (3rd Cir. 1977). In Chapman, the police entered the defendant's rented house after obtaining the consent of his landlord and discovered contraband inside. 365 U.S. at 612. The Court held that the officers should have obtained a search warrant, and that the landlord did not have the authority to consent to the search. Id. at 615-17. Chapman is inapposite for several reasons. The search in the present case was not of a residence, but a department-issued vehicle and an office located at the Ramsey County Sheriff's Department. In addition, Sheriff Fletcher, who consented to the searches, had the authority to do so pursuant to departmental policy and in his capacity as Sheriff.

In Speights, a prosecutor learned that a police officer had a sawed-off shotgun in his police locker. 557 F.2d at 362. The prosecutor asked the police chief for permission to break the personal and police-issued locks on the locker. Id. There was no policy concerning the use of personal locks on police lockers, and there was no policy alerting officers that their lockers could be searched. Id. at 363. The court found that the defendant had a reasonable expectation of privacy in the locker and that the shotgun should have been suppressed. Id. at 363-64. This case is distinguishable because of the departmental policy in effect, which alerted employees that all departmental property, including desks and vehicles, could be searched at any time without notice.

The crucial difference between this case and those cited by Defendant Naylon is that neither the landlord in <u>Chapman</u> nor the police chief in <u>Speights</u> had the authority to consent to the search. At oral argument on Defendant Naylon's motion to suppress, his attorney conceded that Sheriff Fletcher had the authority to consent to the search of the office and vehicle, but asserted that the better practice would have been for the agents to obtain a search warrant. However, merely because the agents could have obtained a search warrant, or that it would have been preferable, does not mean they had to do so. A valid consent to search is an exception to the warrant requirement, <u>see</u> <u>United States v. Sanders</u>, 424 F.3d 768, 773 (8th Cir. 2005) (citation omitted), and Sheriff Fletcher's consent was valid.

Defendant Naylon also argues that his children's consent was invalid. He contends that they had no choice but to consent and that they were not advised that they could refuse consent. Police officers may conduct a search without a warrant "if they obtain a voluntary consent from someone possessing adequate authority over the area." <u>United States v. Chaidez</u>, 906 F.2d 377, 380 (8th Cir. 1990) (citing <u>United States v. Matlock</u>, 415 U.S. 164, 171 & n.7 (1974); <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 222 (1973)). Here, the Court finds that Defendant Naylon's adult children had the authority to consent to the search. Defendant Naylon was on vacation in Florida, and his children either lived at the home or were staying there temporarily. A reasonable officer would have concluded that the Naylon children had authority over the residence in the absence of their father.

Whether consent was voluntarily given depends on the totality of the circumstances, including the characteristics of the person and the context of the encounter. <u>Id.</u> (citing <u>Bustamonte</u>, 412 U.S. at 226). Regarding the characteristics of the individual, a court must consider a person's age, intelligence, and education; whether he was under the influence of drugs

16

or intoxicated; whether he was advised of his Miranda rights; and whether he was aware of legal protections because of previous arrests. Id. at 381 (citations omitted). In examining the context in which the consent was obtained, a court should consider the length of time that the person was detained and questioned; whether the person was threatened, intimidated, or punished; whether the police made promises or misrepresentations on which the individual relied; the person's custodial status; whether the encounter was in a public or a secluded place; and whether the person objected to the search or stood by silently. Id. (citations omitted).

In the present case, the Naylon children were both adults at the time they gave their consent. There is no evidence in the record regarding their intelligence, educational background, or whether they appeared to be under the influence. Although they were not advised of their Miranda rights, they were not in custody or interrogated. During the search, Marco Naylon freely moved between the garage and house and was allowed to use the telephone. Marco Naylon had one previous encounter with the police during which he was arrested. The Naylon children were not threatened, intimidated, or punished, and the agents made no promises or misrepresentations. The encounter took place in a familiar place, their home, and they did not object to the search at any time. Nor did Defendant Naylon's lawyer object to the search or instruct Marco Naylon that he should withdraw his consent. Upon examination of the relevant factors, the Court concludes that Defendant Naylon's children voluntarily consented to the agents' entry onto the property and the search of his car.

## III.  RECOMMENDATION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Timothy Conrad Rehak's Motion to Dismiss Counts 1 Through 6 (Doc. No. 22) be **DENIED**;

2. Timothy Conrad Rehak's Motion to Dismiss Count 7 (Doc. No. 23) be **DENIED**;

3. Timothy Conrad Rehak's Motion to Dismiss Count 8 (Doc. No. 24) be **DENIED**;

4. Defendant Timothy Conrad Rehak's Motion to Strike Surplusage (Doc. No. 25) be **DENIED**; and

5. Defendant Mark Paul Naylon's Motion to Suppress Evidence (Doc. No. 34) be **DENIED**.

Dated: June 5, 2008

   s/ Susan Richard Nelson
SUSAN RICHARD NELSON
United States Magistrate Judge

Pursuant to D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **June 20, 2008**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within ten days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.